[Cite as *Dunbar v. Beacom*, 2023-Ohio-857.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY

| | | |
|---|---|---|
| ERICA DUNBAR | : | |
| | : | |
| Appellant | : | C.A. No. 2022-CA-19 |
| | : | |
| v. | : | Trial Court Case No. 22 CV 90 |
| | : | |
| JOE BEACOM, ET AL. | : | (Civil Appeal from Common Pleas |
| | : | Court) |
| Appellees | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on March 17, 2023

. . . . . . . . . . .

JANE M. LYNCH & JARED A. WAGNER, Attorneys for Appellees

MICHAEL L. WRIGHT & ROBERT L. GRESHAM, Attorneys for Appellant

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Plaintiff-Appellant Erica Dunbar appeals from the trial court's order granting summary judgment to Defendant-Appellee Joe Beacom. For the following reasons, we reverse the judgment of the trial court and remand the cause for further proceedings consistent with this opinion.

I.      Facts and Course of Proceedings

{¶ 2} At around 7:00 a.m. on the morning of November 1, 2018, Beacom was driving north on Nashville Road on his way home from working the third shift at a distribution warehouse in Tipp City.   At that same time, Dunbar was attempting to place her two trash bins just off Nashville Road in front of the house in which she lived at 1865 Nashville Road.   The weather conditions were rainy, and it was dark outside. Ultimately, Beacom hit Dunbar with his vehicle, resulting in Dunbar's being thrown and left unconscious in her driveway.   Beacom waited by Dunbar until Dunbar's mother called for emergency assistance.   Beacom suffered numerous injuries from the collision, including two broken hips, a shattered pelvis, injuries to the right side of her butt, and a gash on her head.

{¶ 3} On February 20, 2020, Dunbar commenced an action against Beacom in the Common Pleas Court of Miami County, alleging that Beacom had negligently failed to maintain an assured clear distance ahead and had engaged in distracted driving by using a handheld cellphone while driving.   Dunbar was deposed on December 4, 2020. Dunbar testified that, on the morning of the accident, she and her son were living with her mother and stepfather at 1865 Nashville Road.   Dunbar Depo., p. 7-9.   Dunbar was getting her son ready for school at approximately 7:00 a.m.; it was raining and she was fully dressed.   She had on a blue jean jacket.   *Id.* at 31-33.   Dunbar began taking the first of two trash bins out to Nashville Road.   *Id.* at 31-32.   She explained that she had finished placing one trash bin just outside the white line of the road and noticed the headlights of a vehicle coming North on Nashville Road in her direction.   She decided

she had enough time to go back and get the second trash bin. She did not remember what happened after she began heading back to get the second trash bin. *Id.* at 32. Specifically, she testified: "All I remember is I was taking that first trash can out. I set it out. I looked down the street, and I seen a car coming. He was before Swailes Road. I went back to go get the second trash can. I don't know what happened after that, I don't know." *Id.* at 33-34.

{¶ 4} Dunbar testified that she did not walk onto the road when she placed the first trash bin just outside the white line of the road. *Id.* at 39-45. When asked again whether she was on the road at any point, Dunbar testified:

> I have to be -- I was behind the white line. I was -- I wasn't in the street, but I do have to turn [the trash bin] around. And I made sure it was very clear there was no cars. I turned it around and went back to my driveway, but I am not in the street. I have to be in the street because it's on the curb, but I am behind the white line. It's a country road.

*Id.* at 45. Dunbar agreed that in order to have put the trash bin in the position it was found on the morning of the accident, she had to have stood at or near the outer white line of the road. *Id.* at 46-47.

{¶ 5} Dunbar explained that the last thing she remembered happening was that she walked into her driveway to get the second trash bin, and she saw her mom and son walking out of the house. *Id.* at 49-50. She explained:

> No, mind you – no, mind you, I was facing my mother. So my – my
> front body was headed facing my house. I seen my mom and my son, so

– and, mind you, I have the impression of his truck in my right side of my butt, so I was facing the house. My body was in the driveway facing my house.

*Id.* at 51.

{¶ 6} After being hit by Beacom's vehicle, Dunbar was found on the ground in her driveway between some rocks. *Id.* at 56. Dunbar conceded that she had no idea how far into the driveway she had been when she was hit by Beacom's vehicle. *Id.* at 55. As a result of the accident, Dunbar had two broken hips, a shattered pelvis, injuries to the right side of her butt, and a gash on her head. *Id.* at 61-62.

{¶ 7} Beacom was deposed on February 12, 2021. He testified that, on the morning of the accident, he had been driving home from his job as a warehouse clerk at the Meijer Distribution facility in Tipp City. His shift went from 10:00 p.m. to 6:30 a.m. Beacom Depo., p. 17-18, 25. After stopping at a gas station to fill up his truck with gas, he eventually turned right onto Nashville Road. *Id.* at 27, 31. It was raining and dark on Nashville Road, and he had his windshield wipers turned on high. *Id.* at 32-33, 73-74. Beacom agreed with counsel's recitation of Beacom's discovery responses that he "saw a handle of a trash can out of the right side of [his] windshield" and then "turn[ed] a hard left while pressing brakes to avoid not hitting the trash can." *Id.* Beacom thought he had hit the trash can, so he stopped his truck and walked back toward where the trash can was. He then saw Dunbar lying on the ground in the driveway. Beacom saw a boy come out of the house, and then a woman came out. The woman called 911 for assistance. *Id.* at 35-47.

**{¶ 8}** Beacom testified that he had at no point crossed the white line on the right side of the road. *Id.* at 35. Rather, he stated that he at some point visualized the handle of the trash can, which caused him to turn a hard left to avoid the trash can. *Id.* at 36. Beacom believed the trash can was in the road across the white line. *Id.* at 38. Another vehicle was heading in the opposite direction on Nashville Road and passed Beacom just before he reached Dunbar's residence. He saw the trash can two or three seconds after the car had passed him. *Id.* at 72-73. Beacom stated he never saw Dunbar but "I had hit – I had seen something go by the window when I went by the trash can. I'm not being – not sure what it was." *Id.* at 60.

**{¶ 9}** Beacom estimated that he was going 35 miles per hour when his vehicle hit Dunbar. But the police report stated that Beacom had stated that he was going between the speed of 45 and 50 miles per hour. Beacom disagreed with the police report. He stated that the police officer decided to make it 45-50 even though Beacom told him he was going between 35 and 40 miles per hour. *Id.* at 57-71.

**{¶ 10}** Exhibit A to Beacom's deposition was a traffic crash report completed by an officer with the Troy Police Department. At the end of that exhibit was a "Traffic Crash Witness Statement" that had been completed and signed by Beacom. The statement explained that Beacom was "going north on Nashville, raining and dark, and out of nowhere I saw trash can then something in front of it. Saw the object, hit the brakes and the object. [T]urned around to see what I hit and it was a girl. The trash can was on the fog line and she was on the road."

**{¶ 11}** In the traffic crash report, Police Officer Steffano stated, in whole:

Unit 1 was traveling NB on Nashville Rd. a two lane country road with a posted speed limit of 55 mph. Unit 1 stated he was traveling between the speed of 45 to 50 mph. Unit 2, a pedestrian, was taking out the trash on the side of a dark/non-lighted road in front of address number 1865. The weather conditions at the time of call was heaving rain/wet roads. Unit 1 stated he did not see Unit 2 and struck Unit 2 with the right side of his vehicle causing functional damage to the headlight. Unit 2 is believed to have gone up onto the hood of Unit 1 due to damage to the antenna and top portion of the hood. Unit 1 stated he did not brake until he hit Unit 2. Unit 1 turned around and came back to the location after realizing he hit something. There was no evidence that indicated Unit 1 had left the roadway or was not in his lane of travel at anytime.

Officer Steffano also noted in a supplement to a Troy Police Department case report that the "[e]xact location of [Dunbar] in the roadway is unknown."

{¶ 12} Following the depositions, Beacom filed a motion for summary judgment. Dunbar then filed a voluntary dismissal of the action. On March 11, 2022, Dunbar refiled her complaint, alleging that Beacom had failed to maintain an assured clear distance and had been distracted by sending or receiving a text message while driving, which resulted in injuries to Dunbar. Beacom then refiled his summary judgment motion. Along with the depositions of Beacom and Dunbar and the police report, Beacom relied on the expert report of Charles R. Scales, which was attached as Exhibit 2 to his motion for summary judgment.

{¶ 13} Scales authored a "Crash Reconstruction Report."   According to the report, Dunbar was found lying in the middle of her driveway approximately 30 feet from the handle side of the trash can that she had placed off Nashville Road.   Expert Report, p. 1.   Scales explained that "[t]he trash cart and a mailbox on the opposite side of the driveway had no sign of impact and would have limited the opportunity for Beacom to drive out of his lane."   *Id.*   The Report noted that "Dunbar's clothing was described as a pink robe by the officer, but she testified that it was a jean jacket.   He did not observe any bright clothing that was white or reflective."   *Id.* at p. 3.

{¶ 14} Scales stated that "[t]here was no physical evidence of braking until [Beacom] stopped to turn around after impact."   *Id.* at 8.   Further, Scales conducted what he termed a "Speed Analysis," trying to reconstruct where Dunbar likely had been and how fast Beacom had likely been going when Beacom struck Dunbar with his truck. According to Scales: "The pedestrian would have been struck then thrown approximately 30 feet if she were standing at the trash cart and landed in the middle of the driveway. The range could include any distance up to 36 feet if the entire width of the driveway is considered and Erica Dunbar's deposition testimony that she was found between the rocks, is accurate."   *Id.* at 8.   However, Scales noted that "[t]he actual impact area, landing area, throw distance and vehicle speed are unknown."   *Id.*   Scales opined that "[t]he analysis of the pedestrian impact with the available evidence, indicates the throw distance is expected to be far enough to place the area of impact on the roadway, near the trash cart while the truck was approaching at a speed that was described as 45-50 MPH."   *Id.* at 11.

{¶ 15} Scales also conducted what he titled a "Pre-Crash Analysis." In this section of his report, Scales attempted to analyze the ability to detect and avoid Dunbar based on the conditions that were likely present on the morning of the accident. Scales used an "Interactive Driver Response Research" software to determine that the average recognition distance for a pedestrian observed on the road in front of the passenger side headlight on a vehicle with similar headlight bulbs that Beacom had on his truck would be 140 feet if the pedestrian was dressed in gray clothing. *Id.* at 14. But that this number would increase to 176.4 feet according to studies involving unlit roadways, independent of headlight condition. However, Scales stated that rain falling would reduce those distances by 12.6% and the glare of oncoming headlights would reduce the detection distances by approximately 31%. Scales then took into account that it takes a half second to move the foot over to the brake. Finally, Scales made what he described as a "reasonable estimate of the best braking effort possible for [Beacom's] truck on the wet asphalt." *Id.* Scales opined: "The available room to brake would potentially allow time to slow down, but not stop. A combination of adjustments for glare and rainfall would further reduce the distances and chance for braking. Braking was possible and may have occurred, but crash avoidance was not a reasonable expectation." *Id.*

{¶ 16} Scales also made the following conclusions in the "Summary" section at the end of his report:

> Dunbar was found approximately 30 feet from the trash cart and she had been thrown less than 38 feet.
>
> The throw distance limits the speed of the truck to less than his stated

speed of 45-50 MPH. The sustained injuries would ordinarily be expected at speeds over 25 MPH. Pre-impact braking would allow for Beacom's stated speed to be accurate, before slowing to cause the throw distance that is evident here.

Dunbar asserted that she was struck outside of the roadway. The undamaged trash cart and undamaged mailbox mark the boundary of the truck's potential path. 25 MPH was not slow enough to make the two successive steering movements that are needed to clear the obstacles, move far enough out of the lane, and still leave a reasonable throw distance.

The rainfall, potential headlight glare and poor reflectivity of Dunbar's clothing created a condition that made it unreasonable to expect that Beacom would detect her early enough to avoid the collision.

Concluding, the evidence does not support the possibility that Dunbar was outside of the lane of travel when she was struck, and the evidence is not consistent with illegal or unsafe speed.

The most likely circumstance was that Dunbar was in the lane and near the trash cart when she was struck at a speed that was between 25 – 45 MPH.

The analysis of the factors that related to when Dunbar could be detected by the average driver, allows for the possibility that Beacom may have had time to brake and reduce his speed, but there is no expectation that Beacom could have avoided the collision at his stated speed of 45-50

MPH.

*Id.* at 15.

{¶ 17} On June 23, 2022, the trial court granted summary judgment to Beacom on all the pending claims. According to the trial court, Dunbar had not identified a triable issue that she was struck in her driveway. Decision, p. 12. Further, the trial court found that Dunbar had failed to take a counter position against Beacom's expert, who opined that it was "unreasonable to expect that Beacom would detect [Dunbar] early enough to avoid the collision." *Id.* at 13. Dunbar filed a timely notice of appeal from the trial court's judgment.

II.     The Trial Court Erred in Granting Summary Judgment to Beacom Where There Were Genuine Issues of Material Fact Regarding Where Dunbar Was When Beacom's Truck Struck Her and Whether Beacom Should Have Seen Dunbar Early Enough to Avoid the Collision

{¶ 18} Dunbar's sole assignment of error states:

THE LOWER COURT ERRED IN GRANTING DEFENDANT SUMMARY JUDGMENT ON PLAINTIFF'S NEGLIGENCE CLAIM.

{¶ 19} Appellate review of a trial court's ruling on a summary judgment motion is de novo. *Schroeder v. Henness*, 2d Dist. Miami No. 2012-CA-18, 2013-Ohio-2767, ¶ 42, citing *Helton v. Scioto Cty. Bd. of Commrs.*, 123 Ohio App.3d 158, 162, 703 N.E.2d 841 (4th Dist.1997). De novo review " 'means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a

matter of law no genuine issues exist for trial.' " *Riverside v. State*, 2016-Ohio-2881, 64 N.E.3d 504, ¶ 21 (2d Dist.), quoting *Brewer v. Cleveland City Schools Bd. of Edn.*, 122 Ohio App.3d 378, 383, 701 N.E.2d 1023 (8th Dist.1997), citing *Dupler v. Mansfield Journal Co., Inc.*, 64 Ohio St.2d 116, 413 N.E.2d 1187 (1980). On such review, we do not grant deference to the trial court's determinations. *Powell v. Rion*, 2012-Ohio-2665, 972 N.E.2d 159, ¶ 6 (2d Dist.), citing *Brown v. Scioto Cty. Bd. of Commrs.*, 87 Ohio App.3d 704, 711, 622 N.E.2d 1153 (4th Dist.1993).

{¶ 20} Pursuant to Civ.R. 56(C), summary judgment is proper when (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds, after construing the evidence most strongly in favor of the nonmoving party, can only conclude adversely to that party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998), citing *Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 653 N.E.2d 1196 (1995), paragraph three of the syllabus. The moving party carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated. *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). To this end, the movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment. *Id.* at 292-293.

{¶ 21} Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleadings. *Id.* at 293. Rather, the burden then shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is a genuine issue of material

fact for trial. *Id.* Throughout, the evidence must be construed in favor of the nonmoving party. *Id.*

{¶ 22} "Summary judgment is a procedural device to terminate litigation and to avoid a formal trial where there is nothing to try. It must be awarded with caution, resolving doubts and construing evidence against the moving party, and granted only when it appears from the evidentiary material that reasonable minds can reach only an adverse conclusion as to the party opposing the motion." (Citations omitted.) *Norris v. Ohio Std. Oil Co.*, 70 Ohio St.2d 1, 2, 433 N.E.2d 615 (1982).

{¶ 23} In his motion for summary judgment, Beacom contended that he did not owe a duty to Dunbar unless he saw or had notice that she was in his lane of travel. Amended Motion for Summary Judgment, p. 10. According to Beacom, Dunbar "suddenly entered Beacom's lane of travel in dark clothing on a dark and raining morning, giving Beacom no opportunity to see her." *Id.* Further, Beacom contended that "it is not possible that [Dunbar] was in the driveway at the time of the accident." *Id.* at 11. Rather, "[b]ased on how far [Dunbar] traveled after impact, she would have had to have been on the roadway, near the trash can." *Id.* at 12, citing Expert Report, p. 11.

{¶ 24} In response to Beacom's motion for summary judgment, Dunbar contended that genuine issues of material fact remained as to where Dunbar was standing when Beacom struck her with his truck, what Dunbar was wearing at the time of the collision, whether Beacom failed to maintain an assured clear distance ahead, and whether Beacom's attention was diverted from the task of driving, creating an unsafe danger to others. According to Dunbar, "[e]xactly what Plaintiff was wearing would drastically

change whether she was reasonably discernible and should therefore be left to the trier of fact." Memorandum in Opposition to Motion for Summary Judgment, p. 9. Further, if Dunbar was not in her driveway but also not standing in the road at the time of the collision, there remained a genuine issue of material fact as to whether Beacom was in violation of the R.C. 4511.33(A)(1). *Id.* at 5. Dunbar did not present any evidence in her opposition to Beacom's motion for summary judgment in support of her distracted driving claim.

**{¶ 25}** The trial court found that Dunbar's belief that she had been struck in her driveway was not reasonable given the expert's reconstruction of the accident. Further, the trial court did its own calculations to determine that "Plaintiff's version of events would not leave Defendant enough reaction time (.75 seconds) to react and avoid the mailbox; moreover, if [Beacom] had hit Plaintiff while she was standing at her trash bin, he would have had only .06 seconds (.81 distance - .75 reaction time) to steer clear of the mailbox." June 23, 2022 Decision, p. 11. This calculation was based on Beacom's stated speed of 35 miles per hour and the assumption "that the reaction time of the average man is about three quarters of a second." *Id.*, quoting *State v. Bush*, 88 Ohio Law Abs. 161, 182 N.E.2d 43, 47 (C.P.1962). The trial court concluded that Dunbar did not "identify any admissible evidence to counter the expert's findings," but rather offered "only speculation and conclusion." *Id.* Therefore, the trial court found that Dunbar had not identified a triable issue that she was struck in her driveway. *Id.* at 12.

**{¶ 26}** The trial court also found that Dunbar had not identified a triable issue that Beacom filed to maintain an assured clear distance ahead, as required by R.C.

4511.21(A). According to the trial court, assuming Dunbar was hit on the road, "[t]he questions remain whether a jury must determine whether Plaintiff suddenly appeared and/or was reasonably discernable." June 23, 2022 Decision, p. 12. The trial court noted that Beacom's expert opined that "[t]he rainfall, potential headlight glare and poor reflectivity of Dunbar's clothing created a condition that made it unreasonable to expect that Beacom would detect her early enough to avoid the collision." *Id.* at 13, quoting Expert Report, p.15. Based on this opinion, along "[w]ith no counter position taken by Plaintiff, except for the conjecture above," the trial court concluded that Beacom was entitled to summary judgment. *Id.*

{¶ 27} Before addressing the trial court's finding that there were no genuine issues of material fact, we will first address Beacom's contention in his appellate brief and at oral argument that we should affirm the trial court's judgment based on Dunbar's failure to present evidence in opposition to Beacom's motion for summary judgment. In particular, Beacom contends that we must affirm the trial court's judgment, because Dunbar failed to present any evidence to the trial court that supported her contention that she was struck by Beacom's truck while she was standing in her driveway. Moreover, Dunbar did not submit any evidence in response to the report of Beacom's expert.

{¶ 28} In *Morris v. Ohio Cas. Ins. Co.*, 35 Ohio St.3d 45, 47, 517 N.E.2d 904 (1988), the Ohio Supreme Court stated:

"[I]t might appear that the nonmoving party *must* respond to an adverse motion for summary judgment or face the entry of judgment against him. However, this court has stated that even where the nonmoving party

fails *completely* to respond to the motion, summary judgment is improper unless reasonable minds can come to only one conclusion and that conclusion is adverse to the nonmoving party. *Toledo's Great E. Shoppers City, Inc.* [*v. Abde's Black Angus Steak House No. III, Inc.*, 24 Ohio St.3d 198, 201-202, 494 N.E.2d 1101 (1986)]. Accordingly, as the burden is upon the moving party to establish the non-existence of any material factual issues, the lack of a response by the opposing party cannot, of itself, mandate the granting of summary judgment.

(Emphasis sic.)

{¶ 29} Although a party opposing summary judgment should always do its best to present evidence in response to the motion, that is not absolutely required by Civ.R. 56 if the party who brought the motion did not carry its initial burden of proving the absence of any genuine issue of material fact. In other words, if genuine issues of material fact remain after the movant's evidence is considered, then summary judgment is not appropriate, regardless of how effective the party opposing summary judgment is in responding to the motion.

{¶ 30} We also note that the trial court focused on the fact that Dunbar's version of being struck while standing in her driveway was so unsupported by the record that it could not create a genuine issue of material fact. We agree that there is no genuine issue of material fact that, when struck, Dunbar was not in her driveway. The trial court then cited to a United States Supreme Court case that held: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." June 23, 2022 Decision, p. 13, quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

{¶ 31} We do not believe the case before us is like the situation the court faced in *Harris*. There, the Court reviewed a denial of a motion for summary judgment filed by a police officer based on sovereign immunity. The underlying facts involved a high speed chase that was caught on camera. The videotape clearly contradicted the version of the story told by the plaintiff. Ultimately, the Supreme Court concluded that plaintiff's "version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." *Harris* at 380-381. In *Harris*, the Court had to choose between only two versions of events, one of which was clearly proven incorrect, especially considering the existence of video evidence. But here, the trial court did not have to choose solely between Dunbar's speculation that she was in her driveway when she was struck or Beacom's contention that Dunbar must have been on the road near the trash bin when he struck her. If there was a genuine issue of material fact whether other scenarios were possible which did not perfectly align with the parties' contentions, the trial court had to consider them before granting summary judgment. For example, if Dunbar was struck when she was a few feet off the road on her way back to her driveway, then summary judgment would not be appropriate. Or if Dunbar was struck while on the road, but Beacom should have seen her sufficiently in advance to avoid her, then summary judgment would not be appropriate.

{¶ 32} As we noted, the overwhelming evidence established that Dunbar was not standing in her driveway when she was struck by Beacom's truck. But the inquiry did not end there. The next question was whether a reasonable juror, after construing the evidence most strongly in Dunbar's favor, could have concluded that Dunbar was struck while she was either standing or walking beside the road on the way back to her driveway. Beacom's expert and the trial court answered this question in the negative. And both made several assumptions and calculations to arrive at their answer.

{¶ 33} The evidence on which the trial court relied in making its determination that no genuine issues of material fact remained included the deposition testimony of Beacom and Dunbar, the police report, Beacom's statement to police, and the expert report. Based on our review of that evidence, we believe genuine issues of material fact remained relating to whether Dunbar was on the road when she was struck by Beacom's vehicle and at what point Beacom should have seen Dunbar sufficiently to avoid hitting her with his truck.

{¶ 34} There was limited evidence of record regarding where exactly Dunbar was standing when she was struck by Beacom's truck. Dunbar's testimony was that she did not step into the road and that she began to walk back to get the other trash bin after she noticed a car coming north on Nashville Road. Although her recollection that she made it to her driveway was contradicted by substantial evidence, we are not convinced this meant a reasonable juror could not have found that she was off the road walking back toward her driveway when she was struck. It could just be that she could not recall exactly what had happened after she placed the first trash can by the road, because she

suffered a traumatic injury when she was struck by Beacom's truck. Beacom's expert, Charles Scales, made it clear in his report that "[t]he actual impact area, landing area, throw distance and vehicle speed are unknown." Although Scales attempted to recreate what he considered to be the most likely scenario based on the information he had reviewed, his recreation was an educated guess, not evidence of what happened. One of the pieces of information on which Scales heavily relied was the police officer's statement that "[t]here was no evidence that indicated [Beacom] had left the roadway or was not in his lane of travel at anytime." But it is unclear what type of investigation went into forming this conclusion. At the time the police officer made this statement, he had only interviewed Beacom and presumably looked around for tire tracks or skid marks. The police officer had not interviewed Dunbar, because she had been taken to a hospital. The police officer also stated that the "[e]xact location of [Dunbar] in the roadway is unknown."

{¶ 35} Beacom's testimony also did not nail down where Dunbar was located when he hit her with his truck. Indeed, Beacom's testimony contained some inconsistencies. First, Beacom testified that he was going approximately 35 miles per hour when he hit Dunbar. But the police report stated that Beacom told the officer that he had been going 45 to 50 miles per hour. Beacom testified that the police officer's report was incorrect and that the police officer just chose to assign that arbitrary speed despite what Beacom had told him. Beacom also testified that he had never crossed the white line on the right side of his lane of travel, but he also testified that at some point he visualized the handle of the trash bin, which caused him to turn a hard left to avoid the trash bin. But it was

undisputed that the trash bin was outside the white line of the road, so avoiding it would not have required a hard left if Beacom's truck was not outside the white line of the road. While Beacom also testified that he thought the trash bin had been across the white line and in the road, even Beacom's expert stated that the trash bin had been outside the white line, and there was no evidence that it had been moved from where Dunbar had placed it a short time earlier.

{¶ 36} In his witness statement that was completed the morning of the accident, Beacom stated that, "out of nowhere I saw trash can and then something in front of it. Saw the object, hit the brakes, and the object. [T]urned around to see what I hit and it was a girl." This statement differed from his deposition testimony where he stated that he had seen "a handle of a trash can out of the right side of [his] windshield" and then "turn[ed] a hard left while pressing brakes to avoid not hitting the trash can." He testified that he did not see Dunbar before hitting her.

{¶ 37} The trial court decided to conduct its own analysis of what was the most likely position of Dunbar by using Beacom's stated speed of 35 miles per hour to determine whether it was possible for Beacom to have hit Dunbar with his truck while Dunbar was standing off the road. The trial court, like Beacom's expert, noted that neither the trash bin nor the mailbox was hit by Beacom's truck. Therefore, both assumed that in order for Beacom to have hit Dunbar while she was standing off the road, Beacom would have had to have hit her while he was traveling the distance between the trash bin and the mailbox, and Beacom would have had to have reentered the road before he reached the mailbox, because the mailbox was not damaged. Both the trial court and

the expert said this scenario was very unlikely. In order to reach its conclusion, the trial court took judicial notice that a vehicle travels approximately 14.67 feet per second for every ten miles per hour of velocity. Then the court took into account that there were 41.6 feet between the trash can and the mailbox. Further, the trial court took judicial notice that the reaction time of the average man is about three quarters of a second. The court concluded that "Plaintiff's version of events would not leave Defendant enough reaction time (.75 seconds) to react and avoid the mailbox; moreover, if Plaintiff had hit Plaintiff while she was standing at her trash bin, he would have had only .06 seconds (.81 distance - .75 reaction time) to steer clear of the mailbox." June 23, 2022 Decision, p. 11.

{¶ 38} Beacom's expert also made calculations based on several assumptions. Importantly, Scales conceded that "[t]he actual impact area, landing area, throw distance and vehicle speed are unknown." Expert Report, p. 8. But Scales then cited to two "technical papers" listing the projection efficiency (pedestrian throw speed divided by vehicle speed) and "the results from numerous pedestrian throws that had similarities to this crash." According to Scales, one of the technical papers demonstrated "[d]istances up to 47 feet (14.3 meters), were ordinarily associated with speeds under 38 MPH (60 kmh). Speeds at 55 MPH or above resulted in throws closer to 170 feet." *Id.* Scales then set out to determine whether it was likely that Beacom could have gone off the road after the trash bin, hit Beacom with his truck, and then re-entered the road without hitting the mailbox. Scales stated that "[t]here would also be a period to move the arms and steer back toward the left. 0.5 second is a known time for limb movements to occur."

*Id.* at 10. Further, Scales opined that "[i]f centered within the lane, the driver would have to use an emergency steering effort to get far enough right, early enough to line up with the proper throw distance range but miss the trash cart." *Id.* Based on these assumptions, Scales concluded that "Dunbar's version of events could not be confirmed even when using an unexpectedly high level of driver performance and vehicle dynamics." *Id.* at 11. Ultimately, Scales opined that the "analysis of the pedestrian impact with the available evidence, indicates the throw distance is expected to be far enough to place the area of impact on the roadway, near the trash cart while the truck was approaching at a speed that was described as 45-50 MPH." *Id.*

{¶ 39} Scales also addressed whether the extent of Dunbar's injuries could help determine how far she was thrown by Beacom's truck. Scales explained that "[t]he extent of her injuries was compared to case files and available pedestrian crash studies. Although similar examples were not located, many studies exist." *Id.* at 12. Scales noted one author "reported that impact speeds below 15 MPH caused severe injury for 9% of pedestrians while 30 MPH increased the risk to 45%." *Id.* at 13. He noted that another study reviewed 293 crashes "and reported severe injuries to the pelvis occurred at speeds above 20 kmh (12 MPH), but with only a few occurring below 41 kmh (25 MPH)." *Id.* But Scales could not determine the distance thrown based solely on her injuries. He conceded that he was unable to locate any similar examples in the crash studies he reviewed.

{¶ 40} We believe that both the trial court and Beacom's expert made several assumptions that conflicted with the summary judgment requirement that the evidence be

construed most strongly in favor of Dunbar. For example, both the trial court and the expert concluded that Dunbar could not have been hit off the road because an average person would not have had the necessary time in which to react when one factors in either a .50 second or .75 second reaction time. The trial court borrowed its reaction time component (.75 seconds) from a 1962 common pleas court case. Scales borrowed his reaction time component (.50 seconds) from an unknown source. But Beacom did not testify to his actual reaction time. Rather, he testified that he braked and made a hard left turn after noticing the trash bin outside the right part of his windshield. The deceleration and hard left turn, if made quickly enough after passing the trash bin and exiting the roadway, could have resulted in Beacom's hitting Dunbar as she stood off the road facing her house and then re-entering the roadway before the truck reached the mailbox. While Scales opined that this was very unlikely, his opinion was based on a reaction time component that was not based on any evidence in the record.

{¶ 41} In short, Scales made several assumptions about the speed Beacom's truck was traveling, the distance Dunbar was thrown, and Beacom's reaction time. He conceded that the actual impact area, landing area, throw distance, and vehicle speed were unknown. He used his experience and the available evidence to reconstruct what he believed to be the most likely scenario that resulted in Dunbar's injuries. But the trial court has a different duty when faced with a motion for summary judgment. The trial court must determine whether any genuine issues of material fact exist after construing the evidence most strongly in Dunbar's favor. Scales did not construe the evidence most strongly in Dunbar's favor. Therefore, we believe there remained a genuine issue of

material fact regarding whether Dunbar was standing off the road when she was struck by Beacom's truck.

{¶ 42} Further, we believe there was a genuine issue of material fact as to whether Beacom should have seen Dunbar sufficiently in advance to have had enough time to avoid hitting her. Beacom's expert concluded that Beacom may have had time to brake and reduce his speed but "there is no expectation that Beacom could have avoided the collision at his stated speed of 45-50 MPH." Expert Report, p. 15. But Beacom testified that his speed was actually 35 mph, which would presumably have given him more time to react than the time his expert used in the calculation. Moreover, Beacom testified that he applied the brakes immediately before hitting Dunbar, which would have further lowered his speed. Also, Beacom's testimony regarding what he saw conflicted somewhat with other evidence in the record. In his written statement completed after the accident, he said that he saw the trash bin and something in front of it. At this deposition, he stated that he saw something go by his window when he went by the trash can. His expert noted that there had been damage to the front driver's side portion of Beacom's vehicle and to the antenna on the hood of his car. Apparently, the expert believed the upper part of Dunbar's body bent toward the vehicle, causing damage to the antenna, while the lower portion of her body received the full impact from Beacom's vehicle. But Beacom testified that he had no idea that he had hit a person until he stopped and went back to check on the trash bin.

{¶ 43} Once again, Beacom's expert made several assumptions. First, the expert assumed that Dunbar had been wearing a blue jacket rather than the pink robe that the

police officer noted. The expert based this assumption on Dunbar's deposition testimony regarding her recollection of what she had been wearing. This was not construing the evidence most strongly in favor of Dunbar. Further, the expert considered the fact that a vehicle was traveling in the other direction than Beacom, which may have decreased Beacom's detection distances by as much as 31%. But Beacom testified this occurred two or three seconds before he hit Dunbar, and Beacom did not testify that the lights of the vehicle traveling in the opposite direction affected his ability to see. Moreover, the expert did not take into account the possibility that the headlights of the other vehicle could have actually illuminated Dunbar's actual position for Beacom if Dunbar had in fact been on the road when the vehicle passed her heading south toward Beacom. These assumptions made by Beacom's expert were not the result of construing evidence most strongly in favor of Dunbar.

{¶ 44} It is understandable why Beacom's expert did not construe the evidence most strongly in favor of Dunbar. Beacom's expert was hired to reconstruct the accident in the most likely way it happened, based on his experience and his review of the available evidence. Part of making such a reconstruction, however, requires the expert to make decisions regarding what variables to include and what assumptions to make when critical pieces of evidence are lacking. It is undisputed that the following critical pieces of evidence were lacking: the actual impact area, landing area, throw distance, and vehicle speed. While Scales's report may be helpful for a juror to consider when the juror is faced with the task of deciding whether Dunbar has established her case by a preponderance of the evidence, we do not believe Scales's report proved the absence of

a genuine issue of material fact, especially in light of his assumptions that ran counter to the summary judgment requirement that the evidence be construed most strongly in Dunbar's favor.

**{¶ 45}** The trial court erred when it granted summary judgment to Beacom. There remain genuine issues of material fact regarding where Dunbar was standing when she was struck by Beacom's truck and when Beacom should have seen Dunbar. The assignment of error is sustained.

III.    Conclusion

**{¶ 46}** Having sustained the sole assignment of error, the judgment of the trial court is reversed, and the cause is remanded for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

WELBAUM, P.J. and TUCKER, J., concur.